IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 20, 2008

**STATE OF TENNESSEE v. JECORY J. LEONARD**

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40700807     Michael R. Jones, II, Judge**

_____

**No. M2008-00179-CCA-R3-CD - filed July 23, 2009**
_____

The appellant, Jecory J. Leonard, pled guilty in the Montgomery County Circuit Court to facilitation of second degree murder and facilitation of attempted first degree murder, Class B felonies. The plea agreement provided that the length and manner of service of the sentences would be determined by the trial court. Following a sentencing hearing, the appellant was sentenced to concurrent sentences of ten years in the Tennessee Department of Correction. On appeal, the appellant challenges the length of the sentences imposed and the denial of alternative sentencing. Upon our review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed**.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES, J., joined. JOHN EVERETT WILLIAMS, J., concurred in results only.

Mart G. Fendley, Clarksville, Tennessee, for the appellant, Jecory J. Leonard.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; John Wesley Carney, Jr., District Attorney General; and Helen Young, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On July 2, 2007, the Montgomery County Grand Jury returned a multi-count indictment charging the appellant with the first degree premeditated murder of Sylvester Hockett, the first degree felony murder of Sylvester Hockett, seven counts of attempted first degree murder, and seven

counts of aggravated assault.[1]  After plea negotiations, the appellant pled guilty to the lesser included offense of facilitation of the second degree murder of Sylvester Hockett and to the lesser included offense of facilitation of the attempted first degree murder of Alonza Slayden.  In exchange for the guilty pleas, the remaining counts of the indictment were dismissed.

A transcript of the guilty plea hearing was not included in the record on appeal.  However, at the sentencing hearing the State submitted the appellant's presentence report as an exhibit.  The report summarized the actions underlying the appellant's guilty pleas as follows:

> Count 2: Defendant, along with several co-defendants, traveled to the area of Caldwell Lane to "fight with some Greenwood boys[."]  As a result, Sylvester Hockett, Jr. was shot in the head and died later at Vanderbilt Hospital.

> Count 15: Defendant, along with several co-defendants, went to an area on Greenwood Avenue to fight.  An altercation between defendant and his friends and another group of individuals started at a local bar.  The "fight" then moved to Greenwood Avenue.

> When defendant and his friends arrived, several shots were fired at the group of individuals.  Victim, Alonza Slayden[,] was in the group of individuals.

The State's first witness at the sentencing hearing was Tyrece Dante Ravana Lowry, a twenty-one-year-old co-defendant of the appellant.  Lowry testified that he had entered a guilty plea for his participation in the incident underlying the appellant's convictions.  Lowry stated that he was a member of a gang called the Bloods and that on the evening in question he was at a club, Tipper's, with some fellow gang members.  While at the club, the Bloods and some "Greenwood boys" were involved in an altercation and shots were fired.  Lowry claimed that his friends did not fire any of the shots.

Lowry testified that afterward, he left the club and went to Deon Murray's residence.  Also at the residence were the appellant, Murray, John Buggs, Deontrea Milligan, Jermaine Smith, Kenny Peachman, and Shawn Robinson.  Lowry said that Peachman, Murray, Milligan, and Smith had guns.  He recalled that the men were "just kicking back" when two females came in and told them that some of the Greenwood boys had made disrespectful remarks to them.  Lowry said none of the Bloods wanted to be "disrespected."

---

[1]  The appellant's attempted first degree murder and aggravated assault charges concerned the following victims: Nikelia Patterson, Alonza Slayden, Jeremy Rugante, Christa Hassell, Cedrick Carney-Henderson, Christopher Fletcher, and DeAuntrey Kelly.

Lowry said that after the Bloods heard about the disrespectful remarks, someone telephoned Ronald Cowling, the leader of the gang, to ask if they should go to Greenwood. Lowry recalled that the appellant said that "he wanted to go up there, so we all was like well, we ain't going to let you leave by yourself." Nine gang members, traveling in three cars, went to Greenwood. The appellant, Smith, and Milligan drove the three cars. Lowry said, "[T]here was a gun in every car." Lowry believed that the appellant knew guns were being taken to Greenwood because the guns had been in the residence and said that "there was some discussion about who had guns and who did not . . . until everybody got in the car." Lowry said that four people were in his car: the appellant, Lowry, Murray, and Buggs. The appellant did not have a gun, but Murray and Buggs each had a gun. Lowry stated that it was not unusual for the gang members to carry guns but that it was unusual for them to shoot at people. Lowry acknowledged that he anticipated the shooting in Greenwood.

Lowry testified that the appellant was driving the lead car. When the Bloods arrived in Greenwood, people were standing outside houses, but, because of the darkness, Lowry could not see how many. Lowry estimated that the Bloods' vehicles were approximately twenty-five or thirty yards away from the houses when the appellant's vehicle began to slow down and the Bloods started shooting. Lowry stated, "Nobody said shoot, but the car slowed down." Lowry said that "the clips were emptied," but he did not know how many shots were fired. Lowry said that he did not see any weapons on the people in Greenwood and that they were not trying to stop the Bloods' vehicles.

Deon LaShaun Murray testified that he was twenty years old and that fellow gang member Deontrea Milligan was his half-brother. He acknowledged that he had pled guilty for his role in the offense and was awaiting sentencing. Murray recalled that on the night of the shooting, some of the gang members gathered at Tipper's. While they were at the club, the appellant fired Murray's pistol into the air. Afterward, the gang members congregated at Murray's trailer. Two girls came to the trailer and told the gang that some Greenwood boys had "basically . . . called [the Bloods] out." The message angered the Bloods. Murray said that the appellant and other people "suggested" going to Greenwood to fight. Murray heard that Cowling, the leader of the gang, had been called and that he had instructed them not to go to Greenwood. Murray said that despite Cowling's instruction, "[the appellant] and Milligan were hyping [the gang members] up to go." Murray acknowledged that without the influence of the appellant and Milligan, he probably would not have gone to Greenwood that night.

Murray testified that the group did not talk about taking guns; however, it was not unusual for them to carry guns. Murray said that four men were in his vehicle; the appellant and Lowry did not have guns, but Murray had a .380 caliber pistol and Buggs had a 9 millimeter pistol. Regardless, Murray averred that he did not anticipate the shooting at Greenwood.

Murray testified said that when the gang members arrived at Greenwood, the appellant stopped the vehicle to allow them to get out of the vehicle and fight. However, before they could exit the vehicle Murray heard gunfire and thought it had come from the Greenwood crowd. He acknowledged that none of the vehicles were hit by gunfire. After Murray heard shots, Buggs began shooting and Murray fired about four rounds from his weapon.

-3-

Clarksville Police Detective Timothy Finley testified that he was the lead investigator in the case. One man, Sylvester Hockett, Jr., was killed by the gunfire. Detective Finley said that nine people, including the appellant, were arrested in connection with the incident. When the appellant was arrested, he initially claimed he was not involved in the crime. However, he later admitted that he was driving one of the three cars. The appellant disclosed to police the names of the individuals who had fired weapons from his vehicle. The appellant said that when the gang members arrived at Greenwood, he stopped the vehicle and the gunfire commenced. The appellant told police he knew Peachman was armed with a shotgun when the gang members left for Greenwood. Detective Finley said none of the perpetrators ever claimed self-defense.

Pittman Brumley, a former cellmate of the appellant, testified on behalf of the appellant. Brumley stated that he had "been born again, in Christ" and that the appellant had a "similar spiritual outlook." Brumley said that he and the appellant shared their spiritual views with other inmates at a Bible study group and a prayer group. Brumley said that the appellant had renounced his gang membership, despite some opposition from his fellow "charge partners." Brumley believed that the appellant had a "sincere desire to know God and to change."

Deputy Samuel Shoopman, a jailer at the Montgomery County Jail, testified that he had never had any problems with the appellant nor had he ever had to discipline the appellant. Thereafter, the State stipulated that the appellant had not had any disciplinary problems in jail.

Pamela Denise Leonard, the appellant's sister-in-law, testified that she had been married to the appellant's older brother, Victor, for eleven years and that she had known the appellant "since he was a baby."[2] She said the appellant's upbringing was "very tough . . . not supportive." The appellant was raised by his mother, and his father was not a part of his life. Pamela said that her home was stable and religious. She testified that if the appellant were released on probation, he would be welcome to stay in her home. She said she believed the appellant now understood the "seriousness of life" and had developed a closer relationship with God.

Victor Leonard, the appellant's brother, testified that he was thirty-eight years old. He said that if the appellant were released on probation, he had a job waiting for him at Victor's workplace. Victor stated that during their childhood, he and the appellant had to fend for themselves. The family moved frequently, and their mother worked. He opined that the appellant did "what he had to do to survive." Victor said that he had "little troubles" when he was younger but that his life turned around when he married.

Victor testified that his family was religious and that it associated only with people who were religious and family-oriented. He said the appellant was welcome to live with him as long as he was willing to abide by the family's rules.

---

[2] Some of the witnesses in this case share a surname. Therefore, for clarity, we have chosen to utilize their first names. We mean no disrespect to these individuals.

Brittney Angelica Lewis, the appellant's twenty-one-year-old niece, testified that she was employed and was a sophomore at Austin Peay University. She said she and the appellant were close growing up. She said that the appellant had changed since he had been in jail, explaining that he smiled more, seemed happy, and had "more of an uplifting spirit." She described the appellant as "mean" and "angry" before his incarceration. Lewis stated that the appellant now had a Christian, spiritual attitude similar to her own.

Lewis testified that when the appellant was growing up, he "didn't always have the most favorable environment." She maintained that because the appellant's family moved so frequently, he "had to adapt to the streets to survive." She opined that because the appellant's father was not actively involved in his life, the appellant felt neglected at home and chose the gang lifestyle.

Erion Wilson, the appellant's twenty-one-year-old fiancé, testified that the appellant's outlook had changed since his incarceration. She said he was calmer, easier to get along with, and had developed a "spiritual side." The appellant told Wilson he admired his brother and his niece, and he realized his family "was there for him." Wilson said she did not know the appellant was in a gang, she had never seen the "gang banger" side of him, and she had never met any of his gang friends.

The appellant's mother, Constance Leonard, testified that she did not have trouble with the appellant until he was fourteen years old. She acknowledged that the family had moved ten or twelve times during the appellant's childhood. Constance said that after the appellant's incarceration, she visited him frequently until she "got stressed" and moved to Atlanta to be with her son, Eddie McMillan. Constance said that since his incarceration, the appellant had become more loving, forgiving, and understanding. She said she became aware of the appellant's gang involvement when he was fifteen years old.

The appellant testified that his childhood lacked stability, and he "ventured out . . . [and] looked up to the people in the street." He said his mother had a difficult time being a single parent. After an injury prevented him from playing ball, he lost interest in school and dropped out at age sixteen. He acknowledged that he had been arrested as a juvenile for underage drinking and that he had truancy problems.

The appellant testified that on the night of the shooting, he and several gang members gathered at Tipper's. Some Greenwood boys showed up, and, when the club closed for the night, the two groups were involved in an altercation. The appellant said the altercation was not physical and consisted mainly of threats and arguing.

He testified that after leaving the club, the Bloods returned to the residence the appellant shared with Murray. Later, some girls came in and told the gang members that they had been disrespected by some of the Greenwood boys. The Greenwood boys told the girls that if the Bloods wanted to fight, they should come to Greenwood. The appellant called Cowling, the leader of the Bloods. Cowling did not forbid the appellant from going to Greenwood, but he told the appellant

there was no need to go. The appellant disregarded Cowling's advice and decided to go to Greenwood.

The appellant testified said that once he decided to go to Greenwood, he did not force other gang members to go with him. The appellant admitted that he drove the first vehicle, but he denied "leading the charge" to Greenwood. He said he thought there would be a fight; he did not anticipate a shooting.

The appellant testified that when the Bloods arrived in Greenwood, they saw eight or nine people gathered in front of houses. The appellant stopped the vehicle so the Bloods could get out and fight. At that point, the appellant heard gunfire but could not establish from where it originated. Buggs and Murray fired their weapons, and the appellant drove away to escape the gunfire. Later, when the appellant was apprehended, he told police about his participation in the events and revealed the names of the other perpetrators. The appellant acknowledged that he knew the gang members typically carried guns and that he had specifically seen Peachman with a gun that night. He further acknowledged that he knew Peachman was on probation for a previous shooting incident. He conceded that everyone who was standing in front of the houses that night had been in extreme danger and could have been killed.

The appellant apologized to the victim's family. He said he had "found the Lord" since his incarceration, and he wanted to get his life together. He said he had renounced his gang membership and would face the consequences of his renunciation. He acknowledged that "drive by shootings" had increased in the area.

The trial court imposed a ten-year sentence for each offense and denied alternative sentencing. On appeal, the appellant challenges the length of the sentences imposed and the denial of alternative sentencing.

## II. Analysis

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d) (2006). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210 (2006); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence(s). See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant

facts and circumstances, this court will accord the trial court's determinations a presumption of correctness.  Id. at (d); Ashby, 823 S.W.2d at 169.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).  Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only.  See Tenn. Code Ann. § 40-35-114 (2006); State v. Carter, 254 S.W.3d 335, 343-44 (Tenn. 2008).  We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion."  Carter, 254 S.W.3d at 345.

On appeal, the appellant argues that the trial court erred in determining the appropriate length of his sentences by finding that the following mitigating factors did not apply to the appellant: the appellant played a minor role in the commission of the offense and the appellant, because of youth or old age, lacked substantial judgment in committing the offense.  See Tenn. Code Ann. § 40-35-113(4) and (6) (2006).  The appellant maintains that the trial court "erred in relying upon an unspoken enhancement factor relating to the [appellant's] alleged gang membership and thereby removing mitigating factor six."  The appellant also contends that the trial court erred by applying enhancement factor (2), that the appellant was a leader in the commission of the offense, and enhancement factor (7), that the offense involved a victim and was committed to gratify the appellant's desire for pleasure or excitement.  See Tenn. Code Ann. § 40-35-114(2) and (7) (2006). Additionally, the appellant argues that because he did not possess a weapon during the offense, the trial court erred in reducing his sentence by only two years.

Initially, as we have noted, the appellant failed to include the transcript of the guilty plea hearing in the record for our review.  This court has previously stated, "A guilty plea hearing often provides an important occasion for the state to present its proof, and thus, it is the equivalent of a trial and should be made part of the record on appeal in order to comply with [Tennessee Code Annotated section] 40-35-210."  State v. Bobby Blair, No. M2002-02376-CCA-R3-CD, 2003 WL 22888924, at *2 (Tenn. Crim. App. at Nashville, Dec. 5, 2003); see also State v. Shatha Litisser Jones, No. W2002-02697-CCA-R3-CD, 2003 WL 21644345, at *3 (Tenn. Crim. App. at Jackson, July 14, 2003).  Accordingly, the appellant's "failure to include the transcript of the guilty plea

-7-

hearing in the record prohibits the court's conducting a full de novo review of the sentence under [Tennessee Code Annotated section] 40-35-210(b)." Jones, No. W2002-02697-CCA-R3-CD, 2003 WL 21644345, at *3. Regardless, from the proof adduced at the sentencing hearing, we conclude that the trial court did not err in sentencing the appellant.

First, we will address the trial court's imposition of enhancement factor (2), that the appellant was a leader in the commission of an offense involving two (2) or more criminal actors. See Tenn. Code Ann. § 40-35-114(2). The appellant contends that he should not be considered a leader in the commission of the offenses because he did not have a weapon and did not plan the shooting. However, the trial court found that the appellant played a "very major role in the commission of the offense[s]," noting that the appellant made telephone calls prior to leaving for Greenwood, encouraged the group to go with him, and drove the shooters to the scene. The proof at the sentencing hearing revealed that the appellant initiated the trip to Greenwood, and, once he decided to go, the other gang members followed suit. Notably, Murray testified that without the appellant "hyping [the gang] up to go," he probably would not have gone to Greenwood. We conclude that the trial court properly found that the appellant was a leader in the commission of the offenses. Moreover, we agree with the trial court that the appellant played a significant role in the commission of the offenses. We further conclude that the trial court properly refused to mitigate the appellant's sentences because he played a minor role in the offenses. See Tenn. Code Ann. § 40-35-113(6).

The appellant also challenges the trial court's application of enhancement factor (7), that the offenses involved a victim and was committed to gratify the appellant's desire for pleasure or excitement. Tenn. Code Ann. § 40-35-114(7). The trial court stated:

> I relate that [factor] back to Tipper's, then to the trailer, where they
> get into a frenzy about going, telephone calls[.] I don't know that it
> is pleasure, but it was certainly excitement, so that they went there
> with the idea of guns, shooting, for excitement.

We again note the witnesses' testimony that "[the appellant] and Milligan were hyping [the gang members] up to go," indicating that the appellant was excited about the prospect of a fight. Moreover, the appellant's own testimony reflects that he wanted to go to Greenwood and that he anticipated the groups would fight. Accordingly, we conclude that the trial court did not err in applying this enhancement factor.

Next, we will address the appellant's complaint that the trial court erred by not applying mitigating factor (6), that the appellant, because of youth or old age, lacked substantial judgment in committing the offense. Tenn. Code Ann. § 40-335-113(6). Regarding this issue, the appellant maintains that the trial court "erred in relying upon an unspoken enhancement factor relating to the [appellant's] alleged gang membership and thereby removing mitigating factor six."

Our supreme court has stated that in determining whether factor (6) is applicable,

courts should consider the concept of youth in context, i.e., the defendant's age, education, maturity, experience, mental capacity or development, and any other pertinent circumstance tending to demonstrate the defendant's ability or inability to appreciate the nature of his conduct.

State v. Adams, 864 S.W.2d 31, 33 (Tenn. 1993).

The appellant testified that he decided to go to Greenwood to fight. He was aware that various gang members were taking guns to Greenwood. The appellant knew that Peachman, who had a shotgun, was on probation for a shooting offense. Despite this knowledge, the appellant chose to engage in a fight with a rival gang. Like the trial court, we believe that the proof demonstrates that the appellant "made a calculated judgment about the prospects for violence in the situation in which [he] placed himself." State v. Kelley, 34 S.W.3d 471, 481-82 (Tenn. Crim. App. 2000). There is nothing in the record to indicate that the appellant lacked substantial judgment because of his youth. Moreover, the record does not reflect that the trial court relied upon the appellant's alleged gang membership to deny mitigating factor six. The trial court merely stated that the appellant's decision making process was hampered by the influence of his gang membership not by his age. In our view, the trial court properly declined to apply mitigating factor (6).

The appellant also argues that the trial court erred in reducing his sentence by only two years due to the appellant not possessing a weapon during the offense. At the sentencing hearing, the trial court stated that if the appellant "had a weapon in his own hand, I would have no hesitation . . . to give him twelve years. . . ." After considering the various enhancement and mitigating factors, the trial court imposed a sentence of ten years. The appellant's complaint is essentially a challenge to the trial court's weighing of enhancement and mitigating factors. Our supreme court has cautioned that "the 2005 amendments deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." Carter, 254 S.W.3d at 344. Therefore, we are bound by a trial court's decision as to the length of the sentence "so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346. In the instant case, the trial court complied with the purposes and principles of the Sentencing Act. Thus, we conclude that the trial court did not err in imposing ten-year sentences.

Finally, the appellant argues that the trial court erred in denying probation. Generally, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6). The appellant was convicted of two Class B felonies. Therefore, he is not considered to be a favorable candidate for alternative sentencing. However, an appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a) (2006). The appellant's sentences meet this criteria.

Under the 1989 Sentencing Act, sentences which involve confinement are to be based on the following considerations contained in Tennessee Code Annotated section 40-35-103(1):

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

See also State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, a court should consider the defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. See Tenn. Code Ann. § 40-35-103(5).

The trial court denied alternative sentencing based upon the need to deter others and to avoid depreciating the seriousness of the offense. In State v. Hooper, 29 S.W.3d 1, 10-12 (Tenn. 2000), our supreme court specifically noted five factors for consideration when denying probation solely upon the basis of deterrence:

> 1) Whether other incidents of the charged offense are increasingly present in the community, jurisdiction, or in the state as a whole.
>
> . . . .
>
> 2) Whether the [appellant's] crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from the criminal behavior.
>
> . . . .
>
> 3) Whether the [appellant's] crime and conviction have received substantial publicity beyond that normally expected in the typical case.
>
> . . . .
>
> 4) Whether the [appellant] was a member of a criminal enterprise, or substantially encouraged or assisted others in achieving the criminal objective.
>
> . . . .

-10-

5) Whether the [appellant] has previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions.

In the instant case, the appellant admitted that drive-by shootings had increased in the area. Additionally, the record reflects that the appellant was a member of a criminal enterprise when he and his gang decided to perpetuate violence against rival gang members. Further, the appellant's own testimony reflects that his conduct was "the result of intentional, knowing, or reckless conduct." Accordingly, we conclude that the trial court did not err in denying alternative sentencing on this basis.

In order to deny an alternative sentence to avoid depreciating the seriousness of an offense, a court should determine if the criminal act is especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree. See Zeolia, 928 S.W.2d at 462. In the instant case, the appellant and his gang, armed with guns, drove to Greenwood anticipating a confrontation. According to the proof at the sentencing hearing, there was no physical evidence to suggest that any of the people in Greenwood were armed. Nevertheless, several shots were fired at eight or nine individuals, one of whom was killed. The appellant acknowledged that all the individuals were in "extreme danger" and could have been killed. We conclude that the trial court did not err in denying probation based upon the seriousness of the offenses.

### III.  Conclusion

Finding no error, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-11-